(No. 23874.—)

RAYMOND S. HOSKINSON *et al.* Appellants, *vs.* H. R. LOVE-LETTE, Admr. *et al.* Appellees.

*Opinion filed December 10, 1936.*

BEN S. TOWNSEND, and FRED W. GEE, for appellants.

CONGER & ELLIOTT, and CREIGHTON & THOMAS, for appellees.

Mr. JUSTICE FARTHING delivered the opinion of the court:

Appellants, who are some of the heirs-at-law of Zula Seiler, filed a bill in the circuit court of Wabash county to set aside her will. They charged that the testatrix lacked testamentary capacity at the time her will was executed, on August 21, 1928, and that the will was executed under the wrongful influence of her sister, Maude. The issues were presented to a jury, who found that the instrument in question was the last will and testament of Zula Seiler. The chancellor refused to grant a new trial and entered a decree sustaining the will, and this appeal followed.

Eight witnesses testified for appellants and a like number for appellees. Zula Seiler, the testatrix, was one of six daughters who survived their father, Sebastian Seiler. Four of the daughters married and reared families. Zula and Maude were never married. They lived with their mother in the family home in Mount Carmel until she died, in 1900, and remained together until Maude died, on May 13, 1931. Zula was eight years older than Maude, and was sixty-eight years old at the time she executed her will, on August 21, 1928. Both sisters were deaf, but Zula's hearing was much more impaired. She resorted to writing as a means of communication. Because of Zula's greater deafness Maude carried on most of their dealings with the public, but the proof shows they consulted each other before decisions were made. The two sisters owned in common their homestead, a majority interest in a building which was rented to the F. W. Woolworth Company, and a near by farm. They also managed a farm of 160 acres owned by their relatives. They had approximately $12,000 worth of personal property. Shortly before August 21, 1928, Maude went to their attorney and instructed him to prepare reciprocal wills for herself and Zula. The wills as drawn were identical in form, substance and phraseology,

except that in each will the other sister was made the sole beneficiary and executrix. Each will provided that in case of the death of the sister prior to the testatrix the property should then go to named beneficiaries, who were exactly the same in each will. Maude took the instruments home, and a few days later she and Zula returned to their attorney's office. This attorney, Dorothy Utter, his secretary, and L. E. McKittrick, cashier of the American National Bank of Mount Carmel, attested both wills. The attorney asked Zula if the instrument was her will, and she replied that it was. The proof shows that she had to be asked three or four times in a loud tone of voice if the instrument was her will, but there is nothing to show that the necessity of repetition was caused by a want of mental capacity. When she finally understood the question she signified that it was her will. The record shows that the execution of the will was regular in every particular. The three attesting witnesses testified at this trial. The attorney who drew the two wills expressed the opinion that Zula was of unsound mind when she executed her will. His stenographer expressed no opinion as to the mental condition of the testatrix, and the bank cashier said he had no reason to believe that at the time she executed her will she was of unsound mind. The county court denied probate, but on appeal the circuit court allowed the petition and admitted the will to record.

The attorney testified that he had been acquainted with Maude and Zula Seiler since 1900. He lived across the street from them and had represented them many times. He stated that Maude told him that she and Zula had read the wills, and that Zula told him it was her will she was about to execute. He said that Maude suggested that they call the bank cashier as one of the witnesses. He related an instance where the sisters had had trouble with a neighbor about an alley back of their house. He was employed to resist the payment of drainage assessments. Both

the sisters always insisted their assessments were too high. They thought that one of the drainage commissioners was making the assessments so high that they would not be able to pay, in order that he might thus get their land. He said that they always had trouble with their farm tenants and changed tenants about every year. Zula took an abusive attitude toward her tenants, insisting that they were dishonest and indifferent about her crops. The testatrix felt superior to her neighbors, and had on occasions referred to them as "low-down trash." She was suspicious that they were trying to injure her and her property. He said that both women were very strong-willed and inclined to be insistent upon what they thought were their rights.

The court admitted in evidence, over the objection of the contestants, the order of the county court admitting the will of Maude Seiler to probate and appointing Zula Seiler executrix, her oath as such, letters testamentary, and her final report. The attorney admitted that these exhibits were either prepared in his office at his direction or that he knew of their execution. He said he did not tell the other two attesting witnesses that he thought at the time she executed her will that Zula was of unsound mind. He also considered her incompetent at the time he represented her in the administration of Maude's estate, but said he did not tell the county judge of his opinion or suggest that a guardian *ad litem* should be appointed, because the court was as well acquainted with Zula as he was. He discussed the competency of Zula with the county judge during the administration of Maude's estate but did not express an opinion as to her sanity. In settling Maude's estate Zula signed whatever papers he asked her to sign without any knowledge of their contents, and also verified some of them. He testified that there had been a fire at the store building in 1933, five years after the execution of the will, and that Zula objected to his paying for the repairs to the building, stating that she needed the money for other purposes. He

had taken charge of the insurance money and had made these repairs because Zula was then incompetent.

Appellants' witness Dr. S. W. Schneck testified that in his opinion the testatrix was incompetent at the time she executed her will. He was a physician and surgeon who had been practicing medicine since 1898 but did not qualify as an expert on mental diseases. It is admitted that the testatrix died of senile dementia and that she was committed to the Anna State Hospital for the Insane in 1934. The witness testified that the first symptoms appeared in 1924, and she became progressively worse until her death. He related nothing that definitely described her condition at the time she executed her will, in 1928, and from all that appears his opinion could well have been based on his observations of Zula in the years immediately preceding her death rather than at the time her will was executed. The facts upon which he based his opinion did not necessarily indicate that the testatrix was of unsound mind. For instance, he testified that she would forget whether she had paid him and would argue over his bills. She would not be able to describe where her pains were when he was called in to treat her and could not concentrate long on any train of thought. Whether her failure to concentrate was due to her deafness rather than to insanity is not disclosed by the testimony of this witness.

Appellants' witness W. H. Wetzel was of the opinion that the testatrix was not of sound mind and memory. He had known her for twenty-five years and she had been a customer at his bakery. He said he always got along with her, but that she was very deaf and eccentric.

Anna Terry, a practical nurse of forty-eight years' experience, testified that in her opinion the testatrix was not of sound mind during the year 1928. She had known her for forty years, but related no facts upon which her opinion could be based. She could not carry on a conversation with Zula because of the latter's deafness but had to resort

to writing, and she said that the testatrix was rather intelligent in answering questions of a few words. She stated that the testatrix was well educated, but had told her that she could not read.

H. E. Piper, a baker, called by appellants, would not say that the testatrix was of unsound mind, but said that she was "daffy or silly" in her actions.

Fay Hoskinson, the wife of an appellant, gave it as her opinion that the testatrix was of unsound mind. Appellants' remaining witnesses gave no opinion as to the mental condition of the testatrix at the time she made her will.

For appellees, E. H. Rhinehart, who had known the testatrix for thirty or forty years and had done painting and various other kinds of work for the two sisters, stated that Zula was peculiar, "but not to the state of being of unsound mind." Mrs. Rhinehart had visited the testatrix from time to time during the thirty-five years she had known her. She was of the opinion that she was of sound mind. Alice Markwith had also known the testatrix intimately for thirty-five years and had visited her often. She lived two blocks away. The testatrix talked to this witness about her property, business and relatives, and she and Maude both told the witness about their wills. She was of the opinion that the testatrix was of sound mind. The testimony of this witness is convincing because of the great array of facts and circumstances upon which she based her opinion. Clarence Gillum had known the testatrix about twenty years and had done work in her home at different times. He said she was of sound mind. Everett Snyder, a grain dealer who had bought grain of the testatrix and her sister, Maude, for fifteen years, stated that the testatrix took part in the transactions with him, and in his opinion she was of sound mind. He continued to buy grain from Zula after Maude's death. Mary Bell Carson had known the testatrix most of her life. They were neighbors, living only a block and a half apart, and visited in each other's

homes frequently. Zula talked to her about her business affairs and relatives. This witness thought the testatrix was of sound mind in 1928. Mary Froman had known the testatrix for thirty years. She sewed for both the sisters and stayed nights with them when she was sewing at their home. Zula talked to her about her property and told her that she and Maude had just made their wills. She said that Maude had gone down to get them drawn, because she was so deaf it was embarrassing for her to have to ask people to repeat things. Zula was interested in politics and would ask her to vote for different candidates she favored. This witness would ask Zula for advice about her business, and she considered her advice good. The testatrix told this witness that the Hoskinsons (appellants) had already got their share, and for that reason they were leaving them nothing.

Appellants contend that the verdict is contrary to the evidence on the questions of testamentary capacity and undue influence. In order to make a valid will the testatrix must have been capable of knowing the extent of her property and the natural objects of her bounty and of understanding the nature and effect of the act of executing her will. (*Donovan* v. *St. Joseph's Home,* 295 Ill. 125, 134; *Dowie* v. *Sutton,* 227 id. 183, 196.) Mere eccentricity does not constitute unsoundness of mind. (*Morecraft* v. *Felgenhauer,* 346 Ill. 415, 421; *Estes* v. *Clark,* 317 id. 585, 588.) Age, sickness or debility of body does not affect the capacity to make a will if the testator has sufficient intelligence remaining to make a will. (*Farmer* v. *Davis,* 289 Ill. 392.) The jury, who heard and saw the witnesses, is the judge of their credibility. In such a case its finding, which has been approved by the chancellor, will not be set aside by this court unless we can say that the verdict was palpably contrary to the weight of the evidence. *Miller* v. *Blumenshine,* 343 Ill. 531; *Mannen* v. *Norris,* 338 id. 322, 327.

We have set out at some length the evidence contained in this record. We find nothing therein to justify or warrant setting aside the jury's verdict and the decree that followed. In spite of the sharp conflict in the evidence, we are convinced that the verdict was right. The evidence shows that the testatrix was fully competent in August, 1928, to make her will. It was not any lack of mentality but rather Zula's greater deafness that caused her sister, Maude, to take the lead in their business matters. In the opinion of the witness Mary Froman, Zula was even more intelligent than her sister. The testatrix sometimes took part in business transactions, sometimes wrote her own checks, had a time deposit at the bank, bought and paid for goods, paid employees for their labor, read newspapers, knew what property she and her sister owned, and mentioned many, if not all, of her relatives in conversations. She and her sister gave two parties at their home in 1927 or 1928—one for the younger and the other for the older friends. She was interested in community affairs and in politics. The facts and incidents on which witnesses for appellants based their opinions that she was mentally incompetent in 1928 show that she was eccentric and was embarrassed by her deafness, rather than of unsound mind when she made her will.

Appellants contend that Maude Seiler was guilty of exercising undue influence over her sister, Zula. In *Huston* v. *Bell,* 260 Ill. 354 which is very similar in many of its facts to the case before us, we said that it was the natural thing for two sisters who had lived together for years to make mutual wills and each leave her property to the other. It is true that Maude visited the attorney's office and directed how the wills should be made, but Zula, in a conversation with one of the witnesses, told her that Maude had gone on this errand, and that Zula would have been embarrassed on account of her deafness had she gone. It is no proof of undue influence or want of mental capacity

that Zula in that conversation said that both the sisters were leaving their property each to the other for her life. The point is that Zula knew Maude had gone to the lawyer's office for a specific purpose, with her full consent and knowledge. Zula accompanied Maude to that office some days later. After some difficulty in making her understand, Zula indicated that the paper prepared for her to sign was her will. The attorney and his stenographer were suggested as witnesses, and Maude requested that the bank cashier be called as an additional witness. Maude could hardly have been exercising undue influence when she made the same provisions by her will that Zula made in favor of Maude by the will in question here. The fact that Maude was eight years younger than Zula is no evidence of undue influence. It is true that she may have had a greater expectancy of life, but that does not prove her guilty of the design to supplant the mind of her sister with her own. She is not shown to have been acting in any fiduciary capacity towards her sister, but rather to have been acting in concert with Zula in the management of their property, their home and affairs, in all of which both sisters seem to have been equally interested. The appellants failed to establish the charge of undue influence.

It is not necessary to set out in detail the subject matter of the testimony offered by appellants, which was objected to as too remote and for that reason excluded. The proposed proof dealt with the testatrix's mental condition two or more years subsequent to the day she executed her will. It is admitted that the testatrix died as a result of senile dementia. That disease is progressive, and it requires no citation of authorities to demonstrate that one so afflicted could not possibly be in the same mental condition in 1930 or thereafter as in August 21, 1928, when she made her will. We have examined the rulings of the chancellor and find them to be correct.

We have read each of the ten refused instructions in connection with the seventeen which were given to the jury at the request of appellants and the fourteen which were given at the request of appellees. It is not necessary to prolong this opinion by setting them out at length. All we need say is that almost every point contained in the ten was covered in the given instructions. Some of the refused instructions were bad for other reasons. The given instructions fully covered appellants' theory of the case. We find no error in the refusal of these instructions.

There is no merit in the contention that it was error to instruct on the theory of appellees as well as on that of appellants.

For the reasons herein before set out, the decree of the circuit court of Wabash county is affirmed.

*Decree affirmed.*